**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CHRIS TALLEY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL MOTORS, LLC,<br><br>Defendant. | Civil Action No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

1.      Plaintiff Chris Talley ("Plaintiff") brings this action for himself and on behalf of all persons in the United States who purchased or leased any 2010 to present Chevrolet Camaro ("Class Vehicles") designed, manufactured, marketed, distributed, sold, warranted, and/or serviced by General Motors LLC ("GM" or "Defendant"). Plaintiff alleges as follows:

## **INTRODUCTION**

2.      This is a consumer class action concerning a failure to disclose material facts and a safety concern to consumers.

3.      General Motors LLC manufactured, marketed, distributed, and sold the Class Vehicles without disclosing that the Class Vehicles' starters and/or the heat shielding around them were defective in design, workmanship and/or material.

4.      The Class Vehicles are equipped with starters that are prone to premature failure, both within and outside of the warranty periods, which necessitates costly repairs and replacements. These problems can cause the car to fail to start, particularly in hot weather or after the vehicle has just been driven.

5.      On information and belief, GM in designing and manufacturing the Class Vehicles, installed defective starters and/or heat shields, failed to install them correctly, and/or failed to account for the levels of heat the starter and the surrounding components would be subject to from the rest of the vehicle.  Vehicles, including the Class Vehicles, have heat shields installed to protect

the starter and the surrounding components from the heat.  However, in the Class Vehicles, upon information and belief, the heat shield is insufficient to protect the starter and the surrounding components from soaking up the heat, which increases the resistance within the starter until it burns out (collectively, the "Starter Defect").  The Starter Defect can also damage attached components, including the wiring and the battery.

6.  On information and belief, the Starter Defect manifests in the following manner: the starter is slow to start the vehicle or fails to start the vehicle at all, often in hot weather or after just being been driven; wiring to and from the starter is damaged and/or melted; and the vehicle's battery wears out faster than normal.  Some Class Members have also experienced other problems with the electrical system due to the stress the Starter Defect places on the vehicle's electrical system on the whole.  Other Class Members have also experienced engine problems, which develop when the starter fails and is stuck in a position that damages other engine components.

7.  When the Starter Defect manifests during the warranty period, upon information and belief, GM authorizes its dealerships merely to replace the starter, wiring, and other damaged components with the same defective versions, without improving the heat shielding.  As a result, the Starter Defect manifests again, often outside the warranty period, and Class Members are forced to replace the starter and other damaged components and bear the cost repeatedly.

8.  The Starter Defect is inherent in each Class Vehicle and was present at the time of sale.

9.  GM was well aware of the Starter Defect from pre-production testing, design failure mode analysis, calls to its customer service hotline, aggregate part sales, dealer audits, aggregate warranty information, and customer complaints made to both GM and dealers.  These sources of knowledge and information were exclusively in the possession of GM and its network of dealers and, therefore, unavailable to consumers.

10.  Despite access to aggregate internal data, GM has actively concealed the existence of the Starter Defect by blaming bad batteries and/or the actions of owners and lessees and failed to permanently repair the Starter Defect, instead transferring the costs of repair to consumers.

11.     GM sells the Class Vehicles with a 3-year, 36,000-mile bumper-to-bumper warranty. However, when class members bring their vehicles to GM's authorized dealerships having already required repair of the Starter Defect, and requesting coverage for a subsequent failure, GM denies coverage. As a result, Class Members are paying hundreds of dollars out-of-pocket to repair, money which flows to GM when consumers purchase GM parts.

12.     The Starter Defect is material because it poses a serious safety concern. The failure of a vehicle to start, especially after it has recently been driven, can cause owners to be stranded. In certain instances, the Starter Defect can also damage the electrical system and the engine, which can cause the vehicle to lose power while it is being driven and increases the chance of the vehicle becoming involved in a collision.

13.     The Starter Defect is also material because consumers incur significant and unexpected repair costs. GM's failure to disclose the Starter Defect at the time of purchase is material because no reasonable consumer expects to spend hundreds, if not thousands, of dollars to repair or replace damaged vehicle components that the manufacturer knows will fail well before the expected useful life of the component and damage other components of the vehicle as well.

14.     Had GM disclosed the Starter Defect, Plaintiff and Class Members would not have purchased the Class Vehicles or would have paid less for them.

## THE PARTIES

### Plaintiff Chris Talley

15.     Plaintiff Chris Talley is a Delaware citizen and resident.

16.     On January 16, 2017, Plaintiff purchased a used 2016 Chevrolet Camaro with 17,896 miles on the odometer from Koons Ford of Baltimore in Maryland. Koons Ford of Baltimore is one of many dealerships owned and operated by the Koons Automotive Group. Several of these Koons Automotive Group dealerships are GM-authorized Chevrolet dealerships.

17.     Plaintiff purchased his Camaro primarily for personal, family, or household use.

18.     Passenger safety and reliability were important factors in Plaintiff's decision to purchase his vehicle. Before making his purchase, Plaintiff reviewed GM's official website

regarding the 2016 Chevrolet Camaro, Cars.com, and owner's forums online. Plaintiff also spoke with a salesperson at the dealership regarding the Camaro and went on a test drive with the dealership salesperson. Plaintiff believed that the Camaro would be a safe and reliable vehicle.

19.     GM's omissions were material to Plaintiff. Had GM disclosed its knowledge of the Starter Defect before he purchased his Camaro, Plaintiff would have seen and been aware of the disclosures. Furthermore, had he known of the Starter Defect, Plaintiff would not have purchased his vehicle or would have paid less for his vehicle.

20.     In or around May 2019, with approximately 32,000 miles on the odometer, Plaintiff began to experience the Starter Defect.  His car would start slowly, especially soon after it had been driven.  Eventually, it failed to start at all.

21.     Plaintiff had his vehicle taken to Diver Chevrolet, an authorized GM dealership located in Wilmington, Delaware.  There, the starter, the associated wiring, and the battery were replaced under warranty.  Upon information and belief, no changes were made to the heat shielding of the vehicle, and GM did not extend the warranty on the replaced components.

22.     Despite the repair, Plaintiff's vehicle has begun to manifest the Starter Defect once again, becoming increasingly difficult to start, beginning in the summer of 2020.  Plaintiff's vehicle now has over 40,000 miles on the odometer.

23.     At all times, Plaintiff, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Defendant**

24.     Defendant General Motors LLC is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan. General Motors LLC is registered to do business in the State of Delaware. The sole member and owner of General Motors LLC is General Motors Holdings LLC.  General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan.  General Motors Holdings LLC's only member is General Motor Company, a Delaware corporation with

its principal place of business in the State of Michigan.  General Motors Company has 100% ownership interest in General Motors Holdings LLC.

25.    General Motors LLC, through its various entities, designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles, nationwide and in Delaware.  General Motors LLC is the warrantor and distributor of the Class Vehicles in the United States.

26.    At all relevant times, Defendant was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in Delaware and throughout the United States of America.

## JURISDICTION AND VENUE

27.    This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state than GM, the number of proposed class members exceeds 100, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. 28 U.S.C. § 1332(d)(2)(A).

28.    In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiff would ordinarily expect to try them in one judicial proceeding.

29.    This Court has personal jurisdiction over Defendant because it is incorporated in the State of Delaware; has consented to jurisdiction by registering to conduct business in the state; maintains sufficient minimum contacts in Delaware; and otherwise intentionally avails itself of the markets within Delaware through promotion, sale, marketing and distribution of its vehicles, which renders the exercise of jurisdiction by this Court proper and necessary as GM is "at home" in Delaware.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c). A substantial part of the events or omissions giving rise to the claims occurred in this District. Plaintiff may properly sue GM in this District, GM's state of incorporation.

## FACTUAL ALLEGATIONS

31.     Since 2009, GM has designed, manufactured, distributed, sold, and leased the Class Vehicles. GM has sold, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles in Delaware and nationwide. In 2019, GM sold 2,887,000 vehicles in the United States alone and estimated that it was "the market share leader in . . . North America[.]"[1]

32.     GM has thousands of authorized dealerships across the United States, all of which are under GM's control. GM authorizes these dealerships to sell GM vehicles, parts, and accessories and to service and repair GM vehicles using GM parts.[2] Its net automotive sales through those dealerships, for its North American region totaled $106,366,000 in 2019.[3] GM sells its vehicles to its authorized dealerships, which in turn sell those vehicles to consumers. After these dealerships sell cars to consumers, including the Plaintiff and Class Members, they purchase additional vehicle inventory from GM to replace the vehicles sold, increasing GM's revenues. Thus, Plaintiff's and Class Members' purchase of Class Vehicles accrues to the benefit of GM by increasing its revenues. In addition, GM underscores the importance of its dealerships, as follows: "The quality of GM dealerships and our relationship with our dealers and distributors are critical to our success given that dealers maintain the primary sales and service interface with the end consumer of our products."[4]

---

[1]     *See* General Motors Company 2019 Annual Report (Form 10-K), at 2 (Feb. 5, 2020), available at: https://www.sec.gov/Archives/edgar/data/1467858/000146785820000028/gm201910k.htm (last accessed July 7, 2020).

[2]     *Id.* at 3.

[3]     *Id.* at 26.

[4]     *Id.*

**The Starter Defect**

33.     The starter in any vehicle is the component which cranks the engine and starts a vehicle.  The starter itself is a small electric motor, attached to a solenoid (a cylindrical coil of wire acting as a magnet when carrying electric current) that takes power from the car's battery and delivers it to the starter's motor.

34.     Turning the ignition switch, or pressing the start-stop button, energizes the motor in the starter, engaging the electromagnet inside to push out a rod to which a pinion gear is attached. That pinion gear meets the flywheel on the engine, which itself is attached to the end of the crankshaft.  As the starter turns, the engine turns over, taking in both air and fuel.  Simultaneously, electricity is sent through coil packs and the spark plug wire to the spark plugs, which ignites the fuel in the combustion chamber.

35.     Once the engine turns over, the starter disengages by retracting the rod and removing the pinion gear out of contact with the flywheel.  The electromagnet within the starter also stops.

36.     Due to their location in vehicles, starters can absorb and retain heat from various sources.  When starters absorb heat, the heat adds resistance to the electrical conductors inside, and more power is needed than normal for the starter to function.  There is a limit to the amount of resistance a starter can accept and still function properly.  When a starter has more resistance, the current flow is correspondingly reduced and the starter either turns slowly or eventually stops functioning entirely, often because the solenoid is damaged.

37.     As a result, most vehicles have heat shields installed by the manufacturer to protect the starter from absorbing heat by reflecting heat away from the starter.  Upon information and belief, the heat shield installed in Class Vehicles insufficiently protects the starter from the heat given off by the engine and other vehicle components.

38.     The excessive heat the starter is exposed to also damages the wires leading to and from the starter, often causing them to melt, or damage the fuse box, particularly the starter fuse. A heat-damaged starter will also pull more power than normal from the battery, leading to premature battery failure.

39.     The starter can also fail while it is engaged, such that the engine will turn over, but the starter's pinion and gear remain engaged to the engine's flywheel.  This damages the starter and can also cause damage to the engine.  The Starter Defect can also lead to more widespread problems with the electrical system within the Class Vehicles.

40.     The Starter Defect alleged is inherent in and the same for all Class Vehicles. Despite knowing of the Starter Defect in the fifth generation Camaro, model years 2010 to 2015, Chevrolet made no changes to the starter design or heat shielding materials in the sixth generation Camaro, model years 2016 and on.

41.     Upon information and belief, GM has changed the part number of the starter in Class Vehicles, but starter is nearly identical and the Starter Defect persists.

### The Starter Defect Poses a Serious Safety Concern

42.     The Starter Defect is material to consumers because it presents a serious safety concern.  When drivers pull over or stop driving their car, they may not know that the starter has been damaged to the point of failure and they will be unable to restart the car.  This also causes a problem when a vehicle experiences a stall while being driven and cannot be restarted.  This leaves the vehicle and the occupants stranded, and more likely to be involved in a collision because the vehicle cannot move on its own.

### GM Had Superior and Exclusive Knowledge of the Starter Defect

43.     GM is aware of the Starter Defect and denies the defect exists. GM is also refusing to extend the warranty for the starter and related components or fix the condition which causes the Starter Defect to occur.

44.     As a result, GM's customers have had or will have to pay thousands in out-of-pocket costs.

45.     Most vehicles have a heat shield installed to protect the starter from the high heat generated from the engine.  In designing and selecting the materials used to produce the heat shield, GM failed to account for the extremely high temperatures generated by the engines, or for the

placement of the starter next to the exhaust header and the catalytic converter as shown in Figure 1 below.[5]



**FIGURE 1**

46.     The heat shield in Class Vehicles also does not curve under the starter to protect it from heat on more than one side, but is a simple flat shield, as shown in Figure 2.[6]  Upon information and belief, the heat shield and starter in Class Vehicles also are components that GM uses in other vehicles, in order to save production costs.  However, while these components may be sufficient for other designs and engine configurations, they are insufficient to withstand the heat generated by the Class Vehicles.



**FIGURE 2**

---

[5] "5th Gen Camaro SS Starter Replacement (2010-2015)", (available at https://www.youtube.com/watch?v=oKapUDn7fV8).

[6] *Id.*

47.     <u>Upon information and belief, Class Vehicles have been outfitted with one of the two heat shields shown below in Figure 3.   Neither heat shield is sufficient to protect the starter from the heat generated by the engine.</u>

 

**FIGURE 3**

48.     Upon information and belief, GM monitors customers' complaints made on third party websites and made to the National Highway Traffic Safety Administration ("NHTSA.") Federal law requires automakers like GM to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No. 106-414, 114 Stat.1800 (2000).

49.     Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects.

*Id.* Thus, GM knew or should have known of the many complaints about the Starter Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, GM to the Starter Defect.

50.     The following are complaints concerning the Starter Defect, available through NHTSA's website, www.safercar.gov, which reveal that GM, through its network of dealers and repair technicians, was made aware of many starter failures.

a. **DATE OF INCIDENT:** June 15, 2018
   **DATE COMPLAINT FILED:** July 2, 2018
   **NHTSA/ODI ID:** 11105045
   **VEHICLE:** 2016 Chevrolet Camaro
   **SUMMARY:** INCIDENT #1: ON JUNE 15, 2018, AFTER MAKING MY NORMAL COMMUTE TO AND FROM WORK, I ARRIVED HOME. LATER THAT EVENING, WHEN I TRIED TO START MY CAR, I WAS NOT ABLE TO START IT AT ALL. I WAS UNABLE TO FIGURE OUT WHAT WAS THE ISSUE AND HAD TO HAVE IT TOWED BACK TO THE DEALERSHIP. IT TURNED OUT THAT THE ISSUE WAS THE STARTER – AN ISSUE THAT SHOULD DEFINITELY NOT NEED TO BE OF CONCERN TO A NEW CAR OWNER. WHILE I WAS PROVIDED WITH A LOANER CAR, I WAS HIGHLY INCONVENIENCED DURING MY FATHER[]S DAY WEEKEND.

   INCIDENT #2: WHILE DRIVING CAR TO AN APPOINTMENT ON THURSDAY, JUNE 21, 2018, THE GAS PEDAL GOT STUCK AND I COULD NOT STOP THE CAR. I REPLEATELDY TRIED TO APPLY BRAKES BUT THIS DID NOT WORK. TO AVOID CRASHING, RISKING MY SAFETY AND THE SAFETY OF THE OTHER ROAD USERS, I HAD TO MAKE A QUICK DECISION. THIS DECISION WAS FOR ME TO KICK THE GAS PEDAL TO BREAK IT. IN ORDER TO DRIVE THE CAR TO A SAFE LOCATION, I LITERALLY HAD TO USE AN UMBRELLA IN PLACE OF THE GAS PEDAL TO GIVE POWER TO THE CAR.

b. **DATE OF INCIDENT:** January 21, 2019
   **DATE COMPLAINT FILED:** January 25, 2019
   **NHTSA/ODI ID:** 11172213
   **VEHICLE:** 2012 Chevrolet Camaro
   **SUMMARY:** DRIVING INTO WORK AND THE ENGINE STARTS SUCKING AIR THROUGH THE INNER CABIN, ALL OF A SUDDEN THE ENGINE JUST DIES COMPLETELY HOWEVER THE ELECTRONICS STAYED ON. I TRIED TO START THE CAR AFTER LETTING IT COOL FOR 2 HRS AND THE ENGINE STARTED SHAKING RAPIDLY, THERE ARE NO ENGINE LIGHTS OR ALARMS ON THE DASH. I GET THE CAR TOWED HOME, I TEST THE BATTERY AND ALTERNATOR AND THEY BOTH CHECK OUT. I HAD A FULL TUNE AND TRIED TO FIRE IT UP AGAIN AND THE CRANK

WOULDN'T TURN AND NOTICED THE STARTER WAS ENGAGED. I REPLACED THE STARTER AND THE CAR CRACK WITH NO PROBLEM HOWEVER THE ENGINE KNOCKED UNCONTROLLABLY. THIS CAR FAILED ON ME AND CUT OFF COMPLETELY WITH NO CONTROLS, HAD I BEEN ON THE HIGHWAY I COULD HAVE LOST MY LIFE.

c. **DATE OF INCIDENT:** December 6, 2019
**DATE COMPLAINT FILED:** December 9, 2019
**NHTSA/ODI ID:** 11288050
**VEHICLE:** 2011 Chevrolet Camaro
**SUMMARY:** 2 WEEKS AGO MY CAR WOULDN'T START, SO MY SON REPLACED MY STARTER FUSE. AGAIN THIS PAST FRIDAY DECEMBER 6TH, MY CAR WOULDN'T START. SO I REPLACED THE STARTER FUSE, IT BLEW 4 TIMES. I THEN HAD THE VEHICLE TOWED TO GATEWAY CHEVROLET & HE TOLD ME THAT THE FUSE BOX WAS BAD. BOTH TIMES MY CAR WAS PARK IN A AREA.

d. **DATE OF INCIDENT:** October 25, 2017
**DATE COMPLAINT FILED:** December 19, 2017
**NHTSA/ODI ID:** 11055594
**VEHICLE:** 2016 Chevrolet Camaro
**SUMMARY**: THE CARS PUSH BUTTON START IS NOT WORKING TO START THE CAR, INTERMITTANT. THE CAR SHUTS OFF IN TRAFFIC. THE CARS NEGITIVE BATTERY CABLE, IGNITION SWITCH, WERE REPAIRED BUT THE CAR S HESITANT TO START AGAIN. THE ENGINE FEELS LIKE IT IS GOING TO DIE AGAIN WHIKE DRIVING. THE CAR IS HESITANT ON ACCELERATION.

THE CAR WAS DEEMED A LEMON NOVEMBER 2017 FOR SEVERAL ENGINE, SAFTY, AND SUSPENSION ISSUES BUT GENERAL MOTORS IS KEEPING THE CASE IN APPEALS DUE TO NON-COMPLIANCE TO REPLACE THE UNSAFE CAR AWARDED BY THE ARBITRATOR.

e. **DATE OF INCIDENT:** October 19, 2010
**DATE COMPLAINT FILED:** October 20, 2010
**NHTSA/ODI ID:** 10361456
**VEHICLE:** 2010 Chevrolet Camaro
**SUMMARY**: 2010 CHEVROLET CHEVY CAMARO V6, SUDDEN LOSS OF POWER, COMPLET ELECTRICAL FAILURE, AND ENGINE SHUTDOWN WHILE DRIVING 30 MPH IN SUBDIVISION. PULLED TO SIDE OF ROAD. TURNED CAR "OFF" AND BACK ON. DROVE TO DEALER WHO SAID THEY COULD FIND NO PROBLEM AND NOTHING RECORDED IN CAR'S COMPUTER. GOOGLED RECALL OF V8 TO SHOW DEALER, BUT DEALER SAID THIS WAS UNRELATED. *TR

**Customer Complaints on Third-Party Websites**

51.     Consumers similarly complained about the defect on various online forums, often buying new starters from GM and discussing various remedies, including improving the heat shielding to prevent the problem from reoccurring.  However, when consumers take their vehicles to GM dealership for repairs, no improvement is made to the heat shielding. In fact, GM denies there is defect and instead claims that slow starting is normal, or else blames the installation of aftermarket stereos or bad batteries. On information and belief, GM monitors such third party websites as a regular practice, and would have been aware of such postings about issues being complained about as to its vehicles.  The three largest American car manufacturers in particular, GM, Ford, and Chrysler, have made the monitoring of consumer complaints as posted on third-party websites a part of their brand and reputational management for at least a decade.[7] Below are some examples of complaints regarding the Starter Defect on consumer boards (errors in original).

   a.  **December 23, 2014, pomomp, an owner of a 2014 Camaro SS 1LE posted:**
       Hi everyone,

       I just purchased a '14 camaro 1LE,

       I've been scouring the forums for this issue that I'm having to no avail. Most threads are either inconclusive or don't have same symptoms as me…

       Anyway, when my car is hot, or after recently switching it off, it struggles to start – it cranks for longer and when it finally fires up, the stabilitrak warning lights come on and the car drives rough.

       I've replaced the battery as I've read that could be the issue. Worked for a while then had the same issue later that day. It only happens when the car is hot.

       I'm at the dealership and they don't seem to know what it might be and need to hold on to the car for a few days – which I think will end up a dead end. They reckon it could be a fuel pump. On top of this, I live over 200km from my nearest dealer so I'm in a tough position.

       The car only has 10,000 km on the clock. I'm going to have the battery and ground

---

[7] *See* Read, Richard, "Taking your car complaint online? Chrysler, GM, and Ford will see it.", *Christian Science Monitor*, Aug. 21, 2012 (available at https://www.csmonitor.com/Business/In-Gear/2012/0827/Taking-your-car-complaint-online-Chrysler-GM-and-Ford-will-see-it.) (last visited Aug. 26, 2020).

wires all checked, but apart from that, I don't know what else to do! I've also read that heat wrapping the starter might help, can anyone tell me where I can find it on this car?

Any other suggestions? (Available at https://www.camaro5.com/forums/showthread.php?t=389338)

**December 24, 2014, keving2873, an owner of a 2011 Camaro 2SS RS replied:** I have had similar problems. Had a dealership check the battery and they found that the starter was trying to pull way more juice from the battery than normal (I don't remember how much exactly). They decided to swap the starter and after that everything seemed to be back to normal. It has been a few months and I seem to be getting back into the same situation. The starter sounds very labored when I got to start the car only minutes after having turned it off, say like when you get gas or something.

So I would say the starter would be a good thing to check, but that might not be a lasting fix… (Available at https://www.camaro5.com/forums/showthread.php?t=389338)

**December 25, 2014, Low Saturn, an owner of a 2011 Camaro 2SS/RS, replied:**

Subscribed.

Mine does the same thing. Fires right up without issue in the morning or after sitting several hours. But if I restart it after driving it a little while, it struggles a bit to start. Almost like you're trying to start it with a slightly low battery.

But if the battery were low, the opposite would happen. (Available at https://www.camaro5.com/forums/showthread.php?t=389338)

b. **December 19, 2017, Lampslife, an owner of a 2016 Camaro SS posted:** SO THIS IS THE SECOND STARTER THAT HAS BEEN INSTALLED ON MY 16 SS. NOW, THIS STARTER IS STARTING TO DO THE SAME THING AS MY FIRST ONE DID AFTER 2 MONTHS OF RUNNING GREAT. WHEN THE NEW STARTER WAS INSTALLED MY CAR WOULD CRANK UP IN NO TIME HALF A SECOND AND NOW IT TAKES ABOUT 2, HAVE YOU ALL EXPERIENCED THIS ISSUE WITH YOUR CARS AND IF YOU HAVE WHAT SHOULD I DO. I REMEMBER HAVING THIS DISCUSSION A WHILE BACK AND SOMEONE SAID I SHOULD WRAP MY STARTER IN THIS SORT OF HEAT BLOCKING WRAP BUT WHO KNOWS I COULD REALLY USE YOUR HELP! ON THE VIDEO LINK SKIP TO 4:15 SECONDS TO HEAR THE ISSUE IM HAVING. (*Available at* https://www.camaro6.com/forums/showthread.php?t=516508)

**December 19, 2017, Red Leader, an owner of a 2016 Camaro 1SS posted a reply:** I had the same issue. Would only happen on hot days after driving hard and

then shutting car down and trying to restart shortly after, like within 5-10 minutes. Starter finally toasted itself about 3 months ago. Starter was replaced under warranty and haven't had any issues since, but I haven't driven it hard on a hot day yet to see if it will do it again. (*Available at* https://www.camaro6.com/forums/showthread.php?t=516508)

**December 19, 2017, fxdxron1, an owner of a 2016 Camaro 1SS, posted another reply:** Is the engine cranking slowly? Or does it sound normal just taking longer to start? Mine always start slow when hot and I let it sit for about 10 minutes. Some on here think it is normal to start slowly when hot. This is never a normal condition. I am taking mine to the dealer for the second time (*Available at* https://www.camaro6.com/forums/showthread.php?t=516508)

**December 19, 2017, Calvear0, an owner of a 2016 Camaro SS, replied**: I'm having the same issue on my 2016 ss. Hopefully it's just the starter. Mine cranks at times and it won't start at all. Then a burned smell happens right after. They told me that's because of my audio sound system I put on. Don't believe that, I've had it for over a month and now it's happening. (*Available at* https://www.camaro6.com/forums/showthread.php?t=516508&page=2)

**October 31, 2019, leadfoot93, an owner of a 2016 Camaro 1SS replie**d: I just had to have my starter replaced only 28k miles on it. Car was dead in my driveway, had to have it towed to the dealer. (*Available at* https://www.camaro6.com/forums/showthread.php?t=516508&page=3)

**November 1, 2019, martelds, an owner of a 2016 Camaro 2SS, replied**: Had the same issue, GM said my battery was bad gave me a new battery it seemed better. But on hot days and driving hard, I live in AZ so everyday is hot. It seemed to work for a while. Then it started again. I replaced my battery myself but the problem still persists. The problem has to be the started getting cooked. I'm at 48,000 miles now. I called my dealer they said they would take a look since I have a record of complaining about it, but no promises. I'll problem have to make an extended warranty claim, but they time I'm going to wrap the headers and the started with heat shield. It's the starter it's not the battery. (*Available at* https://www.camaro6.com/forums/showthread.php?t=516508&page=3)

c.  **May 14, 2017, JERRYwss6, an owner of a 2011 Camaro SS, posted:** Car won't start when hot. I let it cool down for about 20-30 minutes and it'll start no problem. .(*Available at* https://www.camaro5.com/forums/showthread.php?t=495026)

d.  **March 12, 2015, Mb6000, an owner of a 2011 Camaro 2SS, posted:** Has anyone figured out why our cars don't start or start hard when hot. Car will start fine when cold. Tried searching and never found out what the issue really is. Anyone have the answer. Heard to replace battery, starter, or crank sensor. (*Available at* https://www.camaro5.com/forums/showthread.php?t=399658)

**March 13, 2015, hazy, an owner of 2011 Camaro 2SS, replied:**

yep. I get this problem. Struggles to start, then when it does fire up, throws the TC/ST lights, tach doesn't work, and get the 'Service Stabilitrac' warning.

I've looked everywhere, and decided that it's the starter getting too hot. I am considering having my headers ceramic coated, but in order to avoid the down time for that, I'm going to get either a new hood, or some hex vents to [hopefully] reduce engine bay temps.

If that doesn't help (and I'll know sometime this summer, bc it gets pretty warm here) I'll figure out the best starter for a replacement. (*Available at* https://www.camaro5.com/forums/showthread.php?t=399658)

**March 25, 2015, camarostart2010, an owner of a 2011 Camaro SS, replied:** I have the same issue. Besides a weak battery in the summer do to a higher resistance with temp, and so much music in my car. When the car was hot and shut off between a few mins to an hr it would not turn on or I would take a few seconds to fire. Very annoying, and taxing on the start to say the least. It is a definite temperature related issue. It only happens after the car was hot or running a while. It could be super cold and the cars always fired up. I am definitely going to change my starter to a much better unit. Thank you guys. (*Available at* https://www.camaro5.com/forums/showthread.php?t=399658&page=2)

**April 5, 2015, MANNYS2SS/RS, an owner of a 2010 Camaro 2SS, replied:** Any up date with the starter? I have been having the same problem for a while. I installed a new battery and checked all wires and grounds, but no luck. (*Available at* https://www.camaro5.com/forums/showthread.php?t=399658&page=2)

**April 6, 2015, RGRCamaro, an owner of a 2011 Camaro 2SS, replied:** Manny, I started a thread about this issue last week, OP commented that the starter he replaced it with, so far as fixed the issue! Another guy just replaced his starter with the OEM starter this weekend, so far has fixed his issue as well.  I am going to replace mine as well.  (*Available at* https://www.camaro5.com/forums/showthread.php?t=399658&page=2)

e. **August 7, 2017, OnkelMatze, an owner of a Camaro 2SS, posted:**

I had these starting issues when engine was hot, like at a stop after a while of driving cold starts worked fine….
-    bought new battery, same
-    bought a new starter, same
-    wrapped starter with heat shield, same

gauged the volt value at the starter when engine was hot, there were 2 volt less than directly from the battery in the trunk

solution:
installed an additional ground wire from the engine block to the chassis, now hot starts work same as cold starts (*Available at* https://www.camaro5.com/forums/showthread.php?t=504199)

**August 9, 2017, jdpeezy91, an owner of a 2012 Camaro 2SS RS, replied:** Im

having pretty bad electrical and hot start problems here to, would like to know where you ran this ground to on the sub frame or body do you have to drill a hole for it or bolt it to an existing point? (*Available at* https://www.camaro5.com/forums/showthread.php?t=504199)

f.   **August 11, 2018, BayStreet510, an owner of a 2016 Camaro SS, posted:** So it's a 2016 SS. It runs great. No issues. Sometimes when I start it, the starter sounds like it's having a hard time. The cranking sound will get super slow and even pause for a second in total silence mid crank then turn the motor over. It's never failed to start and the battery is new.

Dealer said it's just how it is. Is this normal? It makes me nervous sometimes thinking that it will fail to start. Would an aftermarket high-performance starter help               this?               (*Available               at*: https://www.camaro6.com/forums/showthread.php?t=536145)

**August 13, 2018, SSDan, an owner of a 2016 1SS, replied:** I don't think its because no cares but more so that this issue has been posted numerous times and no one has a definitive answer to give. Solutions that may or may not help have been battery replacements, starter replacements, wrapping starter with heat shield and battery cable replacement. To date the results for these remedies has been a mixed bag.

I have this issue any time I have a hot start after a series of short such as the second or third stop at the bank or a store where the car is only off for a few minutes. So far I have had some very slow cranks but it has always found a way to start. Id oes not give me confidence in the car's ability to start though. I try to arrange to avoid doing a series of short trips. I have also noticed that more people with 2016's post about this than others. I didn't start having slow starts until about one year of ownership. I now have 2.5 years of ownership and 18K miles – original battery, starter – etc.

I have not taken mine to the dealership because I'm sure I will get the all is normal answer. Although I should probably do that before the 36 month part of the warranty               expires.               (*Available               at* https://www.camaro6.com/forums/showthread.php?t=536145)

**August 13, 2018, jreagle56, an owner of a 2016 2SS, replied:**

Had the issue pop up 3 times so far since brand new. 2016 SS LT1 M6
once right after I got the car. it was a hot august day driving around breaking in the engine, tranny, rear axle and brakes. Returned home and parked the car in garage; had to go right back out a few minutes later; slow turn over, pause and it started.

Didn't happen again until the following year, kind of the same situation.

Then again this year. A 2hr drive to the beach, really hot day, waiting in line to park, stalled car, restart and the starter just barely turned over, started on 2nd rotation, if a 3rd was needed I don't think it would have done it.

Seems like when the starter is heat soaked something goes wrong. There have been hotter days leaving the car to sit awhile and no problem starting. Cold starts, first of the day, no problem, cold winter days, no problem. After a round of golf, car sitting in a hot parking lot on a 100 degree day, no problem.

With this car, the starter cadence isn't the same all of the time (from day 1 till now) which is unlike every other car I have owned. To me, it feels like the starter motor is weak for the work it needs to accomplish or the alignment of the interlocking gears is not prefect or something else unknown going on.

Read about the same problem here with no real solution. Replacing wires and a good battery seems to be a little bit outside of the real problem to me. I don't have enough patients for dropping the SS off at the dealership and waiting for them to reproduce the problems to report to GM and solution to be born on my time, being given a mini van, suv or cruze as a loaner to drive in the meantime. Could be days, weeks, or months. That's the downside to warranty work.

Looked up a new starter on one of the GM parts websites, they are pretty affordable; not sure what it would take to get one installed though. Was considering purchasing one to have on hand in case of a failure. Just my to 2 cents ……. FWIW. (*Available at* https://www.camaro6.com/forums/showthread.php?t=536145)

g. **April 21, 2017, franksredhot, an owner of a 2016 Camaro 1SS posted:** My starter sounds very weak and barely cranks when the engine is hot. There is no problem when the engine is cold. Last time I left it with dealer and they said they couldn't duplicate the problem. I remember my 88 Mustang was doing this and it was a starter problem. Anyone else encounter this in their SS? So far the dealer has done nothing about noisy rear and the weak start. I think I'm going to try a different dealer. (*Available at* https://www.camaro6.com/forums/showthread.php?t=492310)

**April 21, 2017, Daves1SS, an owner of a 2016 Camaro 1SS, replied:** Mine has done this for quite some time now too but I haven't take it to the dealer for it yet. It's a pain with my schedule to get to the dealer. There have been times after shutting it off after say a 45 min drive, then cranking it back up 5-7 min later, that it nearly won't turn over at all. But thank God even when it does it really bad it eventually still does turn over. Seems like starter heak soak maybe? (*Available at* https://www.camaro6.com/forums/showthread.php?t=492310)

**April 22, 2017, quikag, an owner of 2016 Camaro 2SS, replied:** Same deal here, but it has always started so I haven't taken it in. Normal? (*Available at* https://www.camaro6.com/forums/showthread.php?t=492310)

h. **August 12, 2020, raidaru, an owner of a Camaro 2SS, posted:** As u can see in the vid, the car needs like 4ever to start. Same battery tested on other SS, starts right away…….so……what do you think guys? (*Available at* https://www.camaro6.com/forums/showthread.php?t=580055.)

**August 12, 2020, SSDan, replied:** This is a common issue and there seems to be no clear solution.  I had it about 1.5 years ago while still in warranty and the dealer solution was a new battery. Now the issue is back. Many have tried new batteries, starters (or both), wrapping the starter with insulation and even an additional ground wire (engine to frame). The results of all of this are inconclusive.

My issue is always on the restart of a fully warmed up engine that has set only a few minutes. Of late I have popped the hood between starts to get some heat out of the engine compartment. That seems to help. I also do not kill the engine while waiting in line at the bank or whatever. That wastes fuel but I don't risk facing a no start.

I'm convinced this is a heat soak to the starter. Now that I am out of warranty I'm going to look for a better aftermarket starter and battery the next time I have a failed start.

Good luck – it is very frustrating! (*Available at* https://www.camaro6.com/forums/showthread.php?t=580055)

i. **June 21, 2016, LesBaer, an owner of a 2016 Camaro 2SS, posted:** This has happened to me twice now. Both times were on hot days. I was stuck in bumper to bumper traffic on the highway after driving highway speed for over 20 minutes. I hit a traffic jam after curising along with the windows open, Carplay running (music, phone driving apps), and ALP system on. Turned on the AC high and eventually stalled (due to driver error). I went to restart the car and it just barely turned over. I listed all of the above items that were running because they all continue to run when the engine isn't running. My theory is that this is putting much of strain on the battery. Has this happened to anyone else…what do you guys think?

I'm not sure if this is a problem or I simply need a better battery.  I don't stall very often so I don't know yet if this is going to happen every single time under these conditions or is just an isolated incident. The car does turn over, but it was very, very weak…it sounded like it was really struggling to start up. Sounded nothing like the initial start up, which is fine, even if I have the ALP system on, phone plugged in and music on high, and AC going high. I haven't performed many tests yet as I just through to post this. (*Available at* https://camaro6.com/forums/showthread.php?t=457199)

**July 18, 2016, scrap4u, an owner of a 2016 Camaro 2SS, replied:** Interesting

that you posted this as I've noticed the same thing—weak restarts. Today it's it's in the mid 90s here and I'm using Bluetooth for my phone and have ac running moderately. Stopped to get gas and when I restarted the car it really seemed to struggle to start. I then noticed the battery gauge showed maybe an 11 level instead of a 14 where it normally is. I drive my car about twice a week and had just driven it yesterday. Thinking of having the dealer check it before buying a new battery since I only have 1100 miles on it but have had it since February. (*Available at* https://camaro6.com/forums/showthread.php?t=457199*)*

**July 20, 2016, raptor5244, an owner of a 2016 Camaro 2SS, replied:** Same issue here. Weak restarts. It hasn't failed me yet but it sure sounds weak sometimes when restarting. 1100 miles. I drive it just about everyday. (*Available at* https://camaro6.com/forums/showthread.php?t=457199)

**July 21, 2016, irmb, an owner of a 2016 Camaro SS, replied:** I've had the same problem. (*Available at* https://camaro6.com/forums/showthread.php?t=457199)

j. **November 18, 2016, ender2664, an owner of a 2016 Camaro 2SS posted:** I just got done with a 4 hour drive, 1.5 in bumper to bumper and my car wouldn't start :/
I pulled her into the garage, went inside for 5 mins, tried to start her and no luck. It didnt even sound like she was attempting to use the starter. I pressed the ignition button, clutch down of course, and she just made the same exact sound as when I press the button to only turn on the power.
I popped the hood, waited another 15 mins and now she starts right up. Any clue what that was about? (*Available at* https://www.camaro6.com/forums/showthread.php?t=473917)

k. **September 3, 2016, BCKTLST, an owner of a 2017 Camaro SS2, posted:** Order 2017 Camaro SS2 Fifty edition back in May and finally received her 2 weeks ago. I have put 1300 mile on her since we got it, what a sweet ride I will say. We have been looking forward to having her entered today into the big a$$ local town car show since I ordered it. Went out this morning at 6:15 to leave so we would get a spot to show her off and……NOTHING. You could hear what I would say was maybe the fuel pump kicking in and that was it. Now having to deal with being towed, and not tearing the front end up while loading it. NOT the way I expected a brand new car to turn out.

**On September 6, 2016, he posted an update:** Well ~~ Just heard from the dealership. Brad spanking new 2017 Camaro SS2 Fifty and the starter blew apart on the inside. WTF. Had a whopping 2 weeks and 1300 miles. (*Available at* https://www.camaro6.com/forums/showthread.php?t=465553).

l. **On June 29, 2017, Vyncynt, an owner of a 2016 Camaro 2SS, posted:**

Took my 2016 SS to the dealer for weak start analysis. They said they ran a diagnostic on the battery, alternator, and starter, but it diagnosed normal.

After I picked up my car, there was a "Test Report" receipt paper on the dash with the diagnostic results. It showed this:

BAC CODE 171600

Diagnostic Mode
Test Info
CCA 700
Out of Vehicle
Flooded

Results
Good Battery
Rated: 700 CCA
Measured: 794 CCA
Measured Volts: 12.42
Amp Hours: 0.0

I read around on the forums and noticed "heat soak" . I think that might be a factor because it tends to happen after my car is hot and I restart it.

It did not do this last Summer, but I'm worried when it hits 100+ degrees this Summer that it might fail and leave me stranded.

Is there a GM bulletin or warranty covered fix for this?   (*Available at* https://www.camaro6.com/forums/showthread.php?t=499976)

**June 29, 2017, Adrian97c, an owner of a 2016 Camaro, replied:** I live in FL, have the weak start daily. (*Available at* https://www.camaro6.com/forums/showthread.php?t=499976)

**June 30, 2017, bybcous, an owner from a 2016 Camaro 1SS, replied:** Is this only occasional weak start? I have the same problem.   (*Available at* https://www.camaro6.com/forums/showthread.php?t=499976)

**July 3, 2017, Robert215, an owner of a 2016 Camaro SS, replied:** Same here.. after a good 30 of being on when I try to turn it right back on it will sometimes hesitate for even a half second between cranks. Dealer couldn't find anything wrong either (*Available at* https://www.camaro6.com/forums/showthread.php?t=499976)

52.     GM had superior and exclusive knowledge of the Starter Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiff and Class Members before they purchased or leased the Class Vehicles.

53.     Plaintiff is informed and believes, and based thereon alleges, that before Plaintiff purchased his Class Vehicle, and since 2009, GM knew about the Starter Defect through sources not available to consumers, including pre-release testing data, early consumer complaints to GM and its dealers, testing conducted in response to those complaints, high failure rates and replacement part sales data, and other aggregate data from GM dealers about the problem.

54.     GM is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, GM conducts tests, including pre-sale durability testing, on incoming components, including the starters, to verify the parts are free from defect and align with GM's specifications.[8] Thus, GM knew or should have known that the subject starter was defective and prone to put drivers in a dangerous position due to the inherent risk of the defect.

55.     Additionally, GM should have learned of this widespread defect from the many reports received from dealerships and from customer complaints directly to GM. GM's customer relations department collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

56.     Defendant's warranty department similarly analyzes and collects data submitted by its dealerships in order to identify trends in its vehicles. It is Defendant's policy that when a repair is made under warranty the dealership must provide GM with detailed documentation of the problem and the fix employed to correct it. Dealerships have an incentive to provide detailed information to GM, because they will not be reimbursed for any repairs unless the justification is sufficiently detailed.

57.     The existence of the Starter Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle.  Had Plaintiff and

---

[8] Akweli Parker, *How Car Testing Works*, HowStuffWorks.com, http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-testing.htm ("The idea behind car testing is that it allows manufactures to work out all the kinks and potential problems of a model before it goes into full production.") (last viewedAugust 25, 2020).

other Class Members known of the Starter Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

58. On information and belief, the Starter Defect has been so prevalent and GM and its authorized dealers unwilling to help, that owners of Class Vehicles have tried numerous repairs on their own, including but not limited to replacing starters with non-OEM starters, replacing batteries, adding new grounding wires, and/or adding additional heat shielding.

59. Reasonable consumers, like Plaintiff, reasonably expect that a vehicle's starter will function regardless of heat conditions, are safe, will function in a manner that will not pose a safety risk, and are free of defects. Plaintiff and Class Members further reasonably expect that GM will not sell or lease vehicles with known safety defects, such as the Starter Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect GM to fail to disclose the Starter Defect to them and to continually deny it.

<strong>GM Has Actively Concealed the Starter Defect</strong>

60. Despite its knowledge of the Starter Defect in the Class Vehicles, GM actively concealed the existence and nature of the defect from Plaintiff and Class Members. Specifically, GM failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

> (a) any and all known material defects or material nonconformity of the Class Vehicles, including the defects pertaining to the starter;
>
> (b) that the Class Vehicles, including starter, were not in good in working order, were defective, and were not fit for their intended purposes; and
>
> (c) that the Class Vehicles and the starters were defective, despite the fact that GM learned of such defects as early as 2009.

61. As discussed above, GM monitors its customers' discussions on online forums such as www.camaro5.com and www.camaro6.com, and actively concealed the defect by denying the existence of a defect, claiming slow or weak starts are normal condition, and blaming the class members for the problems.

62.     When consumers present their Class Vehicles to an authorized GM dealer for diagnosis and repair, GM refuses to honor the 3-year, 36,000-mile warranty, telling the customers that the condition is normal or else providing ineffective and incomplete repairs.

63.     Accordingly, despite GM's knowledge of the Starter Defect, GM has caused Class Members to expend money at its dealerships to diagnose, repair or replace the Class Vehicles' starters, and other damaged components, once the time limitations have run on the bumper-to-bumper warranty.

### TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

64.     Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the Starter Defect and misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiff and members of the Class were deceived regarding the Class Vehicles and could not reasonably discover the Defect or Defendant's deception with respect to the Defect.  Defendant and its agents continue to deny the existence and extent of the Defect, even when questioned by Plaintiff and members of the Class.

65.     Plaintiff and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that the Defendant was concealing a defect and/or the Class Vehicles contained the Starter Defect and the corresponding safety risk.  As alleged herein, the existence of the Starter Defect was material to Plaintiff and members of the Class at all relevant times.  Within the time period of any applicable statutes of limitations, Plaintiff and members of the Class could not have discovered through the exercise of reasonable diligence the existence of the Defect or that the Defendant was concealing the Defect.

66.     At all times, Defendant is and was under a continuous duty to disclose to Plaintiff and members of the Class the true standard, quality and grade of the Class Vehicles and to disclose the Starter Defect and corresponding safety risk due to their exclusive and superior knowledge of the existence and extent of the Starter Defect in Class Vehicles.

67.     Defendant knowingly, actively and affirmatively concealed the facts alleged herein. Plaintiff and members of the Class reasonably relied on Defendant's knowing, active, and affirmative concealment.

68.     For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

69.     Plaintiff brings this lawsuit as a class action on behalf of himself and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

70.     The Classes are defined as:

> **Nationwide Class:** All persons and entities in the United States who purchased or leased a 2010 to present Chevrolet Camaro (the "Nationwide Class" or "Class").

> **Maryland Class:** All individuals who purchased or leased any 2010 to present Chevrolet Camaro vehicle in the State of Maryland.

71.     Excluded from the Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiff reserves the right to amend the Class definitions if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

72.     Numerosity: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide

substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

73.    Typicality: Plaintiff's claims are typical of the claims of the Class in that Plaintiff, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by GM. The representative Plaintiff, like all Class Members, has been damaged by Defendant's misconduct in that they have incurred or will incur the cost of repairing or replacing the defective starter and/or other damage components. Furthermore, the factual bases of GM's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

74.    Commonality: There are numerous questions of law and fact common to Plaintiff and the Class that predominate over any question affecting Class Members individually. These common legal and factual issues include the following:

(a)  Whether Class Vehicles suffer from defects relating to the starter;

(b)  Whether the defects relating to the starter constitute an unreasonable safety risk;

(c)  Whether Defendant knows about the defects pertaining to the starter and, if so, how long Defendant has known of the defect;

(d)  Whether the defective nature of the starter constitutes a material fact;

(e)  Whether Defendant has a duty to disclose the defective nature of the starter to Plaintiff and Class Members;

(f)  Whether Plaintiff and the other Class Members are entitled to equitable relief, including a preliminary and/or permanent injunction;

(g)  Whether Defendant knew or reasonably should have known of the defects pertaining to the starter before it sold and leased Class Vehicles to Class Members;

(h) Whether Defendant should be declared financially responsible for notifying the Class Members of problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective starter;

(i) Whether Defendant is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective starter;

(j) Whether Defendant breached the implied warranty of merchantability pursuant to the Magnuson-Moss Warranty Act; and

(k) Whether Defendant breached written warranties pursuant to the Magnuson-Moss Warranty Act.

75. <u>Adequate Representation</u>: Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and they intend to prosecute this action vigorously.

76. <u>Predominance and Superiority</u>: Plaintiff and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy or relief.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

## **FIRST CAUSE OF ACTION**
### **Violations of the Maryland Consumer Protection Act**
### **Md. Code. Com. Law §§ 13-101,** *et seq.*
### **(On Behalf of the Maryland Class)**

77.    Plaintiff Chris Talley, individually and on behalf of the Maryland Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Class Action Complaint as if fully set forth herein.

78.    Plaintiff brings this claim individually and on behalf of the Maryland Class against Defendant.

79.    Maryland's Consumer Protection Act ("MCPA") makes it unlawful for a person to engage in any unfair, abusive, or deceptive trade practice in the sale or lease, or offer for sale or lease of any consumer goods, among other things.

80.    Defendant is a "person," Talley and members of the Maryland Class are "consumers," and the Vehicles are "consumer goods" within the meaning of Md. Code Ann., Com. Law §§ 13-101, 13-301, and 13-303.

81.    Defendant violated and continues to violate the MCPA by engaging in the following unfair, abusive, and deceptive trade practices proscribed by Maryland Code, Commercial Law § 13-301 in connection with consumer transactions intended to result in, and that did result in, the sale and/or lease of the Vehicles to Talley and members of the Maryland Class:

> (a) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers (Md. Code Ann., Com. Law §§ 13-301(1));

> (b) Representation that consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have (Md. Code Ann., Com. Law §§ 13-301(2)(i));

(c) Representation that consumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not (Md. Code Ann., Com. Law §§ 13-301(2)(iv));

(d) Failure to state a material fact if the failure deceives or tends to deceive (Md. Code Ann., Com. Law §§ 13-301(3));

(e) Advertisement or offer of consumer goods, consumer realty, or consumer services without intent to sell, lease, or rent them as advertised or offered (Md. Code Ann., Com. Law §§ 13-301(5)(i)); and

(f) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the promotion or sale of any consumer goods, consumer realty, or consumer service (Md. Code Ann., Com. Law §§ 13-301(9)(i)).

82.     Defendant engaged in unfair, abusive, and deceptive acts, omissions, and practices by making misrepresentations to Plaintiff and members of the Maryland Class by marketing and advertising the Vehicles as being capable of starting  and having superior performance when, in fact, the Vehicles suffer from the Defect, and by omitting material facts in connection with the sale and/or lease and advertisement of the Vehicles by failing to inform Talley and the members of the Maryland Class about the Defect.

83.     Talley and members of the Maryland Class, in purchasing/leasing and using the Vehicles, did reasonably act in response to Defendant's above representations or would have considered the omitted facts set forth herein material to their purchasing decision.

84.     The representations regarding the Vehicles were material to Talley and members of the Maryland Class.  Defendant intended that Talley and members of the Maryland Class would rely on these representations and they did, in fact, rely on the representations.

85.     Defendant owed Plaintiff and the Maryland Class a duty to disclose the true nature of the Camaros because Defendant: (a) possessed exclusive knowledge about the defect; (b)

intentionally concealed the foregoing from Plaintiff and the Maryland Class; (c) made incomplete representations about the Camaro, while purposefully withholding material facts from Plaintiff and the Maryland Class that contradicted these representations; and (d) knew of the safety risk, triggering its duty to disclose under the Motor Vehicle Safety Act.

86.     Defendant knew about the Starter Defect at time of sale and lease. Defendant acquired additional information concerning the Starter Defect after the Camaros were sold and leased but continued to conceal information.

87.     Defendant thus violated the MCPA by, at a minimum, employing deception, deceptive acts or practices, fraud, concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale and lease of the Class Vehicles.

88.     Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent mislead Plaintiff and the Maryland Class members.

89.     Defendant knew or should have known that its conduct violated the MCPA.

90.     Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff.

91.     Plaintiff and the Maryland Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Maryland Class members who purchased or leased the Class Vehicles would not have purchased or leased them or would have paid significantly less for them if the Starter Defect had been disclosed.

92.     Defendant had an ongoing duty to Plaintiff and the Maryland Class to refrain from unfair and deceptive practices under the MCPA. All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendant's deceptive and unfair acts and practices made in the course of Defendant's business.

93.     Defendant's violations present a continuing risk to Plaintiff, the Maryland Class, and the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

94.     As a direct and proximate cause of Defendant's violations of the MCPA, Plaintiff and the Maryland Class have suffered injury in fact and/or actual damage, in that they purchased or leased Vehicles with a Starter Defect that is unreasonably expensive to repair and/or replace, particularly since Defendant will not acknowledge the Defect and has not made available a permanent repair. Had Defendant disclosed the true quality, nature and drawbacks of the Vehicles, Plaintiff and the Maryland Class members would not have purchased, or would have paid significantly less, for the Vehicles. Plaintiff and the Maryland Class have suffered further harm in that the Vehicles' starter fail prematurely, they have paid or will be required to pay significantly more to repair or replace the starter than is reasonably anticipated and represented, other electrical system components may be damaged and require replacement, and the Vehicles have suffered diminution in value.

95.     Plaintiff and the Maryland Class are entitled to recover damages, reasonable attorneys' fees and costs, expert expenses, an order enjoining Defendant's unfair and/or deceptive acts and practices, and any other just and proper relief under the MCPA.

## SECOND CAUSE OF ACTION
### Breach of Express Warranty Pursuant to Md. Code. Com. Law §§ 2-313 and 2A-210
### (On Behalf of the Maryland Class)

96.     Plaintiff Chris Talley, individually and on behalf of the Maryland Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Class Action Complaint as if fully set forth herein.

97.     Plaintiff Talley brings this claim individually and on behalf of the Maryland Class against Defendant.

98.     Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Md. Code Com. Law § 2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

99.     With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under Md. Code Com. Law § 2A-103(1)(p).

100.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

101.    The starters were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

102.    In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "Warranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

103.    According to GM, the "Bumper-to-Bumper (Includes Tires) Coverage is for the first 3 years or 36,000 miles, whichever comes first."

104.    Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Plaintiff and the Maryland Class members purchased or leased the Class Vehicles with defective starter.

105.    Plaintiff and the Maryland Class members experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Plaintiff and the Maryland Class members that the Class Vehicles were equipped with defective starter and/or ineffective heat shielding.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Starter Defect.

106.     Defendant breached the express warranty promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

107.     Plaintiff reported his starter failures to Defendant by way of letter notice on or about June 15, 2020. In addition, Defendant was provided with notice of these issues by numerous NHTSA and consumer complaints filed against it, including the instant Complaint and similar legal proceedings, and has actual knowledge of the defect.

108.     As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and the Maryland Class members have been damaged in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**Breach of Implied Warranty Pursuant to Md. Code. Com. Law §§ 2-314 and 2A-212
(On Behalf of the Maryland Class)**

109.     Plaintiff Chris Talley, individually and on behalf of the Maryland Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Class Action Complaint as if fully set forth herein.

110.     Plaintiff Talley brings this claim individually and on behalf of the Maryland Class against Defendant.

111.     Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Md. Code Com. Law § 2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

112.     With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under Md. Code Com. Law § 2A-103(1)(p).

113.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

114.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Md. Code Com. Law §§ 2-314, and 2A-212.

115.    Defendant provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their starter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

116.    Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their starter, which were manufactured, supplied, distributed, and/or sold by GM, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their starter would be fit for their intended use.

117.    Contrary to the applicable implied warranties, the Class Vehicles and their starter at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation.  Instead, the Class Vehicles are defective, including the defective starter.

118.    The alleged Starter Defect is inherent and was present in each Class Vehicle at the time of sale.

119.    Because of Defendant's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Starter Defect, Plaintiff and Class Members were harmed and suffered actual damages in that the Class Vehicles' starter are substantially certain to fail before their expected useful life has run.

120.     As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff and the Maryland Class members have been damaged in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
**Breach of Warranty Pursuant to the Magnuson-Moss Warranty Act,**
**15 U.S.C. § 2303 et seq.**
**(On Behalf of the Nationwide Class)**

121.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

122.     Plaintiff brings this cause of action on behalf of himself and the Class against Defendant.

123.     The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

124.     Plaintiff and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

125.     Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

126.     GM's express warranty is a "written warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

127.     GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

128.     GM provided all purchasers and lessees of Class Vehicles with express and implied warranties.

129.     Under the Warranty, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because

the Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 4 years or 50,000 miles, whichever comes first, for the Class Vehicles.

130.   On information and belief, GM breached the express warranty by:

(a)   Failing to extend the Warranty with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship, including the starter, at no cost to the owner or lessee;

(b)   Selling and leasing Class Vehicles with starter that were defective in material and workmanship, requiring repair or replacement within the warranty period;

(c)   Refusing to honor the express warranty by repairing or replacing, free of charge, the starter and damaged components, but instead providing only other defective and otherwise non-permanent repairs; and

(d)   Purporting to repair the Class Vehicles and/or performing inadequate, illusory repairs, including by falsely informing Class Members that there was no problem with starter on their Class Vehicles, performing ineffective procedures, and/or replacing defective starter or other components with equally defective starter or other components, without actually repairing the Class Vehicles.

131.   Furthermore, GM impliedly warranted that the Class Vehicles were of merchantable quality and fit for use.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their starters were manufactured, supplied, distributed, and/or sold by GM would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their starter would be fit for their intended use while the Class Vehicles were being operated.

132.   Contrary to the applicable implied warranties, the Class Vehicles and their starter at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective design of their starter.

133.    Defendant's breach of implied warranties has deprived Plaintiff and Class Members of the benefit of their bargain.

134.    Plaintiff and members of the Class have had sufficient direct dealings with either GM or its agents (dealerships and technical support) to establish privity of contract between GM, on one hand, and Plaintiff and each of the other Class members on the other hand.  Nonetheless, privity is not required here because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between GM and its dealers, and specifically, of GM's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.  Further, Maryland law provides for privity between a manufacturer and a purchaser. *See* Md. Code Ann., Com. Law § 2-314(1)(a) & (b).

135.    The amount in controversy of the individual claims of Plaintiff and each Class member meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

136.    Defendant has been afforded a reasonable opportunity to cure its breach, including when Plaintiff and Class Members brought their vehicles in for diagnoses and repair of the starter.

137.    As a direct and proximate cause of Defendant's breach of implied warranties, Plaintiff and Class Members sustained and incurred damages and other losses in an amount to be determined at trial. Defendant's conduct damaged Plaintiff and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

138.    Because of Defendant's violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiff and Class Members have incurred damages.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of the Nationwide Class)

139.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

140.    Plaintiff brings this cause of action on behalf of himself and the Class.

141.    As a direct and proximate result of Defendant's failure to disclose known defects, Defendant has profited through the sale and lease of the Class Vehicles. Although these vehicles are purchased through Defendant's agents, the money from the vehicle sales flows directly back to Defendant.

142.    As a result of its wrongful acts, concealments, and omissions of the defect in its Class Vehicles, as set forth above, Defendant charged a higher price for their vehicles than the vehicles' true value. Plaintiff and members of the Class paid that higher price for their vehicles to Defendant's authorized dealers, which are in Defendant's control. Defendant also reaps huge profits from the sales of its vehicles through its authorized dealers, netting $106,366,000 in 2019 alone.

143.    Additionally, as a direct and proximate result of Defendant's failure to disclose known defects in the Class Vehicles, Plaintiff and Class Members have vehicles that require repeated, high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendant.

144.    Defendant has been unjustly enriched due to the known defects in the Class Vehicles through the use money paid that earned interest or otherwise added to Defendant's profits when said money should have remained with Plaintiff and Class Members.

145.    As a result of the Defendant's unjust enrichment, Plaintiff and Class Members have suffered damages.

## PRAYER FOR RELIEF

146.    Plaintiff, individually and all others similarly situated, requests the Court to enter judgment against Defendant, as follows:

(a) An order certifying the proposed Class, designating Plaintiff as named representative of the Classes, and designating the undersigned as Class Counsel;

(b) A declaration that Defendant is financially responsible for notifying all Class Members about the defective nature of the starter, including the need for periodic maintenance;

(c) An order enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendant to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendant to remove, repair, and/or replace the Class Vehicles' defective starter with suitable alternative product(s) that do not contain the defects alleged herein; enjoining Defendant from selling the Class Vehicles with the misleading information; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

(d) An award to Plaintiff and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

(e) Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

(f) Any and all remedies provided pursuant to the causes of action and statutes alleged herein;

(g) A declaration that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of its Class Vehicles or make full restitution to Plaintiff and Class Members;

(h) An award of attorneys' fees and costs, as allowed by law;

(i) An award of pre-judgment and post-judgment interest, as provided by law;

(j) Leave to amend the Complaint to conform to the evidence produced at trial; and

(k) Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

147.    Plaintiff hereby demands a trial by jury of all issues in this action so triable.

Dated:  August 27, 2020                            Respectfully submitted,


Attorneys for Plaintiff,

By: /s/ *Russell D. Paul*
Russell D. Paul (Bar No. 4647)
Abigail Gertner (PHV app. forthcoming)
Amey J. Park (PHV app. forthcoming)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.:    (215) 875-3000
Fax:     (215) 875-4604
Email: rpaul@bm.net
          agertner@bm.net
          apark@bm.net


**CAPSTONE LAW APC**
Steven R. Weinmann (PHV app. forthcoming)
Tarek H. Zohdy (PHV app. forthcoming)
Cody R. Padgett (PHV app. forthcoming)
Trisha K. Monesi (PHV app. forthcoming)
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:     (310) 556-4811
Facsimile:     (310) 943-0396
Steven.Weinmann@capstonelawyers.com
Tarek.Zohdy@capstonelawyers.com
Cody.Padgett@capstonelawyers.com
Trisha.Monesi@capstonelawyers.com


**KEHOE LAW FIRM, P.C.**
Michael K. Yarnoff (Bar No. 3351)
Two Penn Center Plaza
1500 JFK Boulevard, Suite 1020
Philadelphia, PA 19102
Telephone:     (215) 792-6676
myarnoff@kehowlawfim.com